**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**ALLIED CHEMICAL NUCLEAR PRODUCTS, INC., Gulf Oil Corporation, Scallop Nuclear, Inc., General Atomic Company, a partnership, and Allied–General Nuclear Services, a partnership, Defendants.**

No. 79 C 2866.

United States District Court, N.D. Illinois, E.D.

April 28, 1988.

Henry L. Mason, III, Sidley & Austin, Chicago, Ill., for plaintiff.

H. Roderic Heard, Wildman, Harrold, Allen & Dixon, David M. Spector, Isham Lincoln & Beale, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In this diversity breach of contract case, plaintiff Commonwealth Edison Company ("Edison") sued defendant Allied–General Nuclear Services ("AGNS") for breach of an agreement for nuclear fuel recovery services ("Contract"). Currently before the Court is AGNS's motion for partial summary judgment on various damages issues. This opinion will address only one of the issues in that motion, the argument that Edison purchased uranium as "cover" for the uranium allegedly due from AGNS, and that any damages therefrom must be based on the cover price less the Contract's reprocessing charges, not on an alleged market price less the charges. The remaining issues are taken under advisement. Because we find there exists a disputed question of material fact, we deny AGNS's motion for summary judgment under Fed. R.Civ.P. 56(c) on this issue.

We relate the factual background of this case briefly in order to place the legal issue we decide in context. On February 15, 1974, Edison and AGNS entered into a Contract for nuclear fuel recovery services. Nuclear fuel reprocessing involves the removal of uranium and plutonium from fuel assemblies which have been used in commercial nuclear power reactors. The recov-

ered material may then be recycled and fabricated into fresh fuel.

Under the Contract, AGNS agreed to reprocess spent nuclear fuel assemblies from certain of Edison's nuclear reactors during a defined period of time and to deliver recovered products back to Edison. At the time the Contract was executed, AGNS had not completed building its fuel reprocessing plant, and it had not been licensed to reprocess nuclear fuel by the Nuclear Regulatory Commission ("NRC"). The Contract also provided that under certain circumstances prior to AGNS's commencement of commercial operations, AGNS was required to deliver to Edison uranium and plutonium equivalent to that which would have been recovered from Edison's nuclear fuel subject to reprocessing under the Contract. This uranium and plutonium is called "equivalent fissile material" or "EFM."

At some point after the Contract was executed, AGNS ceased work on its fuel reprocessing plant, and thereafter certain events occurred which resulted in the delay of government licensing of reprocessing plants. Some of these events include the decision in *National Resources Defense Counsel v. NRC*, 539 F.2d 824 (2d Cir.1976) (prohibiting NRC from acting on applications for commercial licenses prior to the NRC's final Generic Environmental Statement on Mixed Oxide Fuel ("GESMO") report), and the indefinite postponement of further GESMO hearings by the NRC's GESMO Hearing Board on April 12, 1977 (which decision was appealed and affirmed in *Westinghouse Electric Corp. v. NRC*, 598 F.2d 759, 775–76 (3d Cir.1979)).

By letter dated July 27, 1977, Edison, pursuant to Section 16.1(b) of the Contract, requested that AGNS provide EFM based on certain fuel discharges. AGNS refused, asserting that the Contract had been voided by government action. This lawsuit was filed in 1979.

Summary judgment is appropriate only where the moving party demonstrates that no genuine issue of material fact exists, and it is accordingly entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of clearly establishing the absence of a triable fact issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In calculating the EFM portion of its damages, Edison has taken the market value of uranium and subtracted from it an estimated charge for recovering the same amount through reprocessing under the Contract. AGNS contends this is an inappropriate method to calculate damages because, it alleges, Edison as the aggrieved buyer of EFM "covered," that is, purchased substitute material in the marketplace for the EFM not delivered under the Contract.

Under the Uniform Commercial Code,[1] an aggrieved buyer has a choice of damage remedies following the seller's breach. A buyer may "cover" and have damages under § 2–712 (the cover damage formula) as to all goods affected or the buyer can recover damages for non-delivery as provided in § 2–713 (the market damages formula). Under § 2–712, after "a breach within [§ 2–711] the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." § 2–712(1). Further, the buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages, but less expenses saved in consequence of the seller's breach. § 2–712(2).

The buyer, however, may elect not to cover and may instead base his damages on the market damage formula set forth in § 2–713. Under this section, the measure

---

**1.** The contract provides that New York substantive law should apply. Section 17(12). The parties do not dispute this proposition. The parties also agree that the UCC can apply to this particular issue. AGNS contends that the UCC does not apply to the entire contract, but takes the position that its legal argument is supported under either the UCC or common law. Despite this position, both parties have principally concerned themselves with arguing the application of UCC case law. Because of this, we will also confine our inquiry to the UCC.

of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages, but less expenses saved in consequence of the seller's breach. § 2–712(1).

Official comment 5 to § 2–713 indicates that when a party covers, his damages are measured by § 2–712 and not § 2–713:

> 5. The present section provides a remedy which is completely alternative to cover under the preceding section and applies only when and to the extent that the buyer has not covered.

§ 2–713 UCC Comment 5. Accordingly, a party cannot cover and then pick the market damage formula for recovery just because it would allow a greater recovery:

> Assume that the buyer could obtain the goods below the market price. If he does so he will still only be able to recover as damages from the seller the difference between the cost of cover and the contract price. This, in effect, will give the seller the benefit of the peculiar advantage of the buyer of buying below the market price. Conversely, *the buyer cannot keep this benefit for himself by recovering from the seller the difference between the greater market price and the contract price.*

4 Anderson, *Uniform Commercial Code* 2:712:11 (3d ed. 1983) (emphasis added). (*Accord Cosden Oil v. Karl O. Helm Aktiengesellschaft,* 736 F.2d 1064, 1076 (5th Cir.1984). The issue in this case is thus whether Edison "covered." Edison contends that for the most part it did not cover. It acknowledges that it made one purchase in "cover" for the missing EFM from AGNS. That was a purchase in October 1980 for delivery in 1981. It admits that it acquired other uranium concentrate during the period immediately subsequent to the alleged breach, but it contends that this cannot be considered as "cover." Edison argues that the acquisitions of uranium were not "cover" for the AGNS EFM be-

cause the acquisitions were all pursuant to contracts entered into before the alleged breach.[2]

On the other hand, AGNS points to deposition testimony and an interrogatory answer from Edison which it claims admits that *all* of Edison's acquisitions of uranium from November 1976 through 1979 were intended as "cover":

THE WITNESS: As I understood the question, you asked whether our, in July of 1977, our requirements for uranium for the year 1977 were covered?

BY MR. FREY:

Q. Yes, sir.

A. And the answer is yes, nuclear fuel has a relatively long lead time, and that that lead time is at least a year from the uranium to the reactor, so consequently we have to plan and acquire material well in advance of the need in order to be sure it is there, and the consequences of not having our requirements covered would be loss of a large power plant, which is something that we just can't tolerate, so if it is available, at a price, it is going to be there. We have not got an option. We have to cover our requirements.

Q. In 1977 how far into the future were your nuclear fuel requirements covered?

A. Again, because of our own properties, taking into account all the assumptions I mentioned, I think we thought on paper we were covered for several years. In fact, we were in the marketplace buying uranium during years that we thought we had already an adequate supply because many of the factors that affect both the need for uranium and the availability of that uranium changed from the paper assumptions we had made in '77.

Q. Can you tell me generally what kinds of events occurred that forced you into the marketplace?

A. Yes. First, reserves that we thought would be economic and producible in fact were not.

---

**2.** AGNS wants to use these acquisitions to calculate Edison's damages because Edison paid less under the pre-existing contracts than it would have paid on the open market.

Secondly, depending on when your point of reference is, material that we thought would be available as a result of reprocessing was not available.

Third, some of our contract deliveries were stretched out beyond uranium deliveries, contracted uranium deliveries were stretched out beyond the contemplated delivery time. There were probably other factors, but those are just a few that I can recall offhand.

INTERROGATORY NO. 3. Identify those occasions from November 1976 through 1979 on which Edison purchased uranium in whole or in part as a result of the unavailability of uranium or plutonium which Edison previously had anticipated would be available through reprocessing under the Contract. (*See* deposition of George Rifakes at 533). As to each such purchase, state:

(a) its date;

(b) the vendor of the material;

(c) the form of material (UF6, U308 or other);

(d) the amount of material involved;

(e) the price Edison paid for the material;

(f) the terms of purchase;

(g) the ultimate disposition of the material, the date of such disposition, and if such disposition was sale, the date of sale, the purchaser, and the purchase price.

ANSWER: Pursuant to an agreement between AGNS and Edison, the scope of interrogatory no. 3 has been limited to discovery of any and all specific purchases to which George Rifakes referred in his deposition testimony (page 533).

All of Edison's purchases of uranium from November 1976 through 1979 were a result, at least in part, of the unavailability of uranium or plutonium through reprocessing under the contract with AGNS.

Edison argues that this interrogatory did not include acquisitions of uranium pursuant to pre-existing contracts. Thus, it only referred to the one purchase of uranium in October 1980 for delivery in 1981 from Rocky Mountain Energy. Edison claims that the reason it used the word "all" was because it did not actually examine its files to determine how many, if any, new purchases it made. Rather, Edison made its uranium procurement files available for inspection and copying by AGNS. When it did finally review its files, it determined that its only *new* purchase of uranium was in 1980.

Whether Edison's use of the purchased uranium under the pre-existing contracts was as "cover" for the lack of EFM from AGNS is a question of fact. 4 Anderson, *Uniform Commercial Code* § 2–712:14 (3d ed. 1983). A jury could find that Edison used uranium from the pre-existing contracts to "cover" for the lack of EFM. *See, e.g., Farmers Union Co-op Co. v. Flamme Brothers*, 196 Neb. 699, 245 N.W. 2d 464, 468 (1976). Or a jury could find that Edison did not use the uranium from the pre-existing contracts to "cover." *See, e.g., Cosden Oil*, 736 F.2d at 1076. Based on the evidence presented by each side, we find there is a disputed question of fact as to whether Edison's purchases of uranium under its pre-existing contracts were used to "cover" the missing EFM.

Based on the deposition testimony of George Rifakes and the pertinent interrogatory, a reasonable jury could conclude that, although Edison had pre-existing sources of supply for its uranium requirements, those sources were used to "cover" the need created by the missing EFM from AGNS. However, an equally plausible finding could be made that Edison did not use the uranium purchases under the pre-existing contracts to "cover" whatever use Edison intended to make of the EFM. It would be reasonable to conclude that Edison made sure it had sufficient resources of fuel independent of the EFM to meet its requirements. Thus, its use of the uranium from the pre-existing contracts did not "cover" its intended use of the EFM. In that situation, the market damage formula from § 2–713 would be the appropriate formula to compute damages.

Because this is AGNS's motion for summary judgment, we are to draw all reasonable inferences in favor of the non-moving

party, here Edison. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 460 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Accordingly, drawing all reasonable inferences in favor of Edison, we find that there is a disputed issue of material fact, specifically, whether Edison used uranium secured from suppliers under pre-existing contracts to "cover" its intended use of the non-delivered EFM from AGNS.[3]

In conclusion, AGNS's motion for partial summary judgment on the issue of cover is denied because there is a disputed issue of material fact concerning Edison's use of uranium from its pre-existing contracts. It is so ordered.

---

3. This resolution also rejects Edison's position that its use of the uranium from pre-existing contracts cannot as a matter of law be used as cover. It also rejects its claim that "[a] purchase cannot constitute cover if it would have been made in the absence of the breach." (Memo in Opp. at 30). In both cases, the issue is not the purchase but the use of the materials. If all Edison intended to do with the uranium purchases under the pre-existing contracts was to "store" the uranium to ensure a ready supply in the event its other expected sources of uranium dried up, its use in substitution for the missing EFM would constitute "cover." Accordingly, Edison would only be entitled to the difference between the cover price and the contract price as set forth in § 2–712. On the other hand, if Edison intended to use the purchased uranium for its ongoing needs, then its use would not be considered as "cover" for the missing EFM, and the market damage formula under § 2–713 would be appropriate.