**Affirmed in part; Reverse and Remand in part; and Opinion Filed August 18, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-08-01584-CV

**TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, L.L.C., Appellant**

**V.**

**FPL ENERGY, LLC; FPL ENERGY PECOS WIND I, LP; FPL ENERGY PECOS WIND II, AND INDIAN MESA WIND FARM, L.P., Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 04-10314**

## OPINION ON REMAND

Before Justices Francis, Evans,[1] and Whitehill[2]
Opinion by Justice Whitehill

This contract dispute between TXU Portfolio Management Company, L.P. n/k/a Luminant Energy Company, L.L.C. (TXUPM) and FPL Energy, LLC, FPL Energy Pecos Wind I, L.P., FPL Energy Pecos Wind II, L.P., and Indian Mesa Wind Farm, L.P. (Wind Farms) is before us on remand from the Supreme Court of Texas. The case concerns three contracts requiring the Wind Farms to supply TXUPM with annual quantities of wind generated electricity and related renewable energy credits (the Agreements). The Wind Farms, however, did not meet their delivery obligations.

---

[1] The Honorable Justice David Evans succeeded the Honorable Justice Joseph B. Morris, a member of the original panel and author of the original opinion in this case, upon Justice Morris's retirement.

[2] The Honorable Justice Bill Whitehill succeeded the Honorable Justice Kerry P. FitzGerald, a member of the original panel, upon Justice FitzGerald's retirement.

The supreme court affirmed our previous holding that TXUPM was not responsible for ensuring transmission capacity under those Agreements, but concluded that the Agreements' liquidated damages provisions were unenforceable as a penalty and thus reversed our ruling that TXUPM was entitled to damages based on those provisions. *FPL Energy, L.L.C. v. TXU Portfolio Mgmt. Co. L.P.*, 426 S.W.3d 59, 72–73 (Tex. 2014). The supreme court then remanded the case to us "to determine damages consistent with [its] opinion." *Id*. at 73. The parties provided supplemental briefs on the remaining damages issues.

Our damages analysis turns on two questions the trial court submitted to the jury:

- Question 4 asked the jury to determine TXUPM's market damages for failing to deliver "Renewable Energy," which consists of both wind power generated electricity and its corresponding renewable energy credits; and

- Question 5 asked whether TXUPM covered for the electricity the Wind Farms failed to provide under the Agreements.

Based on the "yes" answer to Question 5, the trial court ruled that TXUPM was precluded from recovering market price based damages. Therefore, the trial court disregarded the $8,900,000 answer to Question 4 and entered a take nothing judgment against TXUPM, which adduced no evidence of damages calculated on a cover basis. TXUPM argues that the trial court erred in doing so because the undisputed facts show that the Wind Farms' defensive cover theory does not apply.

For the reasons discussed below, we sustain TXUPM's fourth point of error[3] and hold that business and commerce code § 2.712(a) requires post-breach conduct taken for the purpose of effecting statutory cover, and, as a matter of law, TXUPM's non-contractual, daily supply and demand balancing activities were not evidence of § 2.712(a) covering transactions. Accordingly,

---

[3] We use the "point of error" nomenclature because that is what TXUPM used in its opening brief.

the trial court erred both by submitting Question 5 over TXUPM's objection and by not disregarding the answer to that question as TXUPM requested.

Because the trial court erroneously relied on the Question 5 answer to ignore the jury's Question 4 market damages finding, and because no party challenged the jury's Question 4 answer in the trial court on legal or factual sufficiency grounds, TXUPM is entitled to recover the $8,900,000 the jury awarded. However, we reject TXUPM's new argument on remand that the market damages award should be increased.

We further conclude that, because TXUPM is entitled to market damages, the trial court erred by concluding that TXUPM was not entitled to retain the $3,075,000 it accessed under the letters of credit the Wind Farms provided to secure their performance under the Agreements. And TXUPM is entitled to recover its attorney's fees because it is the prevailing party on its breach of contract claim.

## I. ISSUES

We address only those issues preserved in the trial court, raised in the original briefs, and that remained after the supreme court opinion. Those issues are whether: (i) the trial court erred by submitting the cover question to the jury and refusing to disregard the corresponding answer; (ii) TXUPM should recover market value damages; (iii) TXUPM is entitled to retain the amounts collected under the letters of credit; and (iv) TXUPM is entitled to recover civil practice and remedies code Chapter 38 attorney's fees.[4]

---

[4] TXUPM acknowledges, and the Wind Farms agree, that, given the supreme court's rulings, we need not consider the following issues previously raised: (1) the trial court's denial of TXUPM's trial amendment; (2) the admission of Dr. Baughman's testimony; (3) the denial of the Wind Farms' motion for JNOV and motion for new trial on their counterclaim; (4) the admission of Dr. Siddiqi's testimony; and (5) the exclusion of evidence in support of the Wind Farms' counterclaim. Although we granted the parties' request to provide supplemental briefing on the remand issues, the parties did not request, nor did we grant, leave to raise new issues.

## II. BACKGROUND

A detailed recital of this case's factual and procedural background is provided in our prior opinion. *See TXU Portfolio Mgmt. Co., L.P. v. FPL Energy, LLC*, 328 S.W.3d 580, 581–85 (Tex. App.—Dallas 2010), *aff'd in part, rev'd in part*, 426 S.W.3d 59 (Tex. 2014). Here, we limit our discussion to the matters needed to resolve the issues before us.

TXUPM sued the Wind Farms alleging that they failed to deliver the contractually required minimum annual quantities of wind generated electric energy (electricity) and related renewable energy credits (RECs) due under the Agreements, and the trial court instructed the jury that the Wind Farms breached the Agreements as TXUPM alleged. The Wind Farms, however, contested TXUPM's legal ability to recover market damages for those breaches by arguing that (i) market price damages under business and commerce code § 2.713(a) are not allowed if the buyer covered for the seller's breaches and (ii) TXUPM covered for the Wind Farms' annual deficiencies within the meaning of business and commerce code § 2.712(a) when it daily replaced from other sources any electricity the Wind Farms did not deliver as projected.[5]

The Wind Farms' argument was based on undisputed evidence of TXUPM's real-time "balancing activities." The parties agree that electricity cannot be stored and therefore, once generated, must be immediately transmitted to its destination. According to TXUPM, real-time balancing refers to the constant adjustments it makes to its electricity supply to ensure that it meets its demand for energy at every given moment, without regard to the Wind Farms' annual deficiencies.

At a pretrial hearing, the parties and the trial court discussed the competing damage theories and the Wind Farms' argument that TXUPM had not produced in discovery, and

---

[5] Section 2.712(a) provides: "After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." TEX. BUS. & COM. CODE § 2.712(a).

therefore could not present at trial, evidence of its cover costs. The Wind Farms contended that the parties had a factual dispute regarding whether TXUPM's conduct constituted cover that should be submitted to the jury. TXUPM, however, argued that cover did not apply because its daily balancing activities did not occur post-breach. The trial court then said that whether TXUPM covered was likely a fact question for the jury and that TXUPM would receive a take-nothing judgment if the jury answered that TXUPM had covered and TXUPM had no evidence of the costs to cover.

Consistent with its prior position regarding cover, TXUPM at trial adduced evidence of only market damages measured at the time TXUPM learned of the breaches. At the close of evidence, the trial court submitted the two damages related questions at issue. Question 4 instructed the jury to answer a market price damages question for combined electricity and RECs (together, Renewable Energy) independent of its answer to the cover question:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [TXUPM] for its damages, if any, that resulted from the Wind Farm's [sic] failure to pay [TXUPM] for the Renewable Energy not provided?
>
> . . . [T]he amount of damages that you determine must be based on the market value of the Renewable Energy the Wind Farms failed to provide to [TXUPM], and this market value should be the market value as of the time that [TXUPM] learned of the Wind Farms' failure to comply with the Agreements.
>
> Consider the following element of damages, if any, and none other.
>
> The difference between the market value of the Renewable Energy not delivered and the contract price for the Renewable Energy provided in the Agreements.

In response, the jury found $8,900,000 in damages.

At the Wind Farms' request, the trial court also submitted Question 5 to the jury, which asked: "Did [TXUPM] 'cover' for the electricity that the Wind Farms failed to provide under the Agreements?" In connection with that question, the trial court instructed the jurors that, "'Cover' means purchasing or producing electricity as a substitute for the electricity promised but not delivered under the Agreements." Because the charge defined "Agreements" to be the

–5–

three contracts at issue, the jury was required to answer this question in light of the Agreements' terms.

TXUPM objected to submitting Question 5 concerning the Wind Farms' defensive cover theory, arguing that there was no evidence of cover and the question was a comment on the weight of the evidence. For support, TXUPM directed the trial court to our sister court's holding in *Jon-T Farms, Inc. v. Goodpasture, Inc.*, 554 S.W.2d 743, 750 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.), *disapproved on other grounds by McKinley v. Drozd*, 685 S.W.2d 7, 10–11 (Tex. 1985), which we discuss below. TXUPM, however, did not object to that instruction for not including § 2.712(a)'s "After a breach" language.[6] The trial court overruled TXUPM's objections and submitted the question to the jury, which found that TXUPM had covered the Wind Farms' failure to provide the electricity due under the Agreements.

Following the verdict, TXUPM moved the trial court to disregard the Question 5 answer and to enter judgment based on the $8,900,000 Question 4 damages answer. To that end, TXUPM argued that Question 5 should not have been submitted since there was no evidence of post-breach replacement electricity purchases. TXUPM, however, did not challenge the Question 4 answer under legal or factual sufficiency grounds as being too low. The trial court denied TXUPM's motion.

Conversely, the Wind Farms moved the trial court to enter judgment that TXUPM take nothing based on the Question 5 answer. The Wind Farms, however, did not alternatively ask the trial court to disregard Question 4 based on legally insufficient evidence to support the $8,900,000 answer to that question. Nor did they ask the trial court to grant a new trial because the evidence was factually insufficient to support that answer.

---

[6] TXUPM objected to the instruction on the basis that the instruction (and the question) should refer to renewable energy instead of just electricity. It did not otherwise object to the instruction's content.

Based on the jury's cover finding, the trial court entered judgment that TXUPM take nothing on its breach of contract claims. The trial court reasoned that the jury's cover finding precluded TXUPM from recovering the damages the jury found because that award was based on an incorrect market price damages measure and there was no evidence of the correct damages measure (cover costs).[7] Consequently, the trial court also declared that TXUPM had to return the $3,075,000 TXUPM accessed as the beneficiary of letters of credit that the Wind Farms posted as security for payments owed to TXUPM under the Agreements. The trial court thus entered judgment that TXUPM take nothing, and denied both parties' request for attorney's fees under the declaratory judgment statute.

TXUPM timely appealed. As noted above, we reversed and rendered judgment for TXUPM based on the Agreements' liquidated damages provisions. The supreme court affirmed in part but reversed our liquidated damages decision, remanding to us the damages issues we discuss below.

### III. ANALYSIS

#### A. Controlling Facts

The controlling facts are few and straightforward:

- Electricity is a fungible, non-segregable product.

- The Agreements required the Wind Farms to deliver specific minimum annual quantities of electricity.

- The Wind Farms failed to meet their annual electricity quotas for the years in question.

---

[7] The trial court had previously held as a matter of law that TXUPM could not recover liquidated damages, which constituted a penalty.

- Generated electricity cannot be stored for future use. Thus, TXUPM must simultaneously match the amount of electricity its customers demand with the amount of electricity its suppliers provide.

- TXUPM daily balanced its customer demands with electricity it acquired from its sources, including electricity it acquired from the Wind Farms.

- The Agreements required the Wind Farms to provide TXUPM on a daily basis a document projecting the amount of electricity that the Wind Farm would deliver to TXUPM the next day.

- But no Agreement contractually required a Wind Farm to deliver electricity according to its prior day's estimate. That is, no Wind Farm ever had a contractual duty to deliver its daily projection amount, and thus no Wind Farm ever breached its Agreement by failing to meet its prior day's estimate.

- TXUPM never made a *post*-year-end electricity purchase to replace electricity that a Wind Farm did not deliver during the prior year.

**B. TXUPM's Fourth Point of Error: Did the trial court err by (i) submitting Question 5, (ii) not disregarding the jury's answer to Question 5, and (iii) not entering judgment based on the Question 4 answer?**

**1. Introduction**

In light of the dissenting opinion's analysis, we begin by discussing the relationship between error preservation and standard of review principles as concerns TXUPM's fourth point of error, which presented the following issue:

> **ISSUE PRESENTED:** Did the trial court err in: 1) submitting to the jury the question of whether TXUPM's undisputed continuous "balancing" of energy supplies to energy demands constituted cover as a matter of law; 2) refusing to disregard the jury's incorrect answer to that legal question; and 3) voiding the jury's award of actual damages to TXUPM on the ground that TXUPM failed to submit evidence of "cover" damages when, in fact, TXUPM did not cover as a matter of law?

Under that point of error, TXUPM argues that the undisputed facts established that its daily balancing activities as a matter of law were not covering activities within the meaning of business and commerce code § 2.712(a) because (i) that statute's words "After a breach" mean that, "Cover is a remedy available to a buyer that necessarily first requires the seller's breach of contract[,]" and (ii) "Courts hold that a buyer's purchases to meet its own commitments that occur before the seller's breach are not cover."

As we understand it, TXUPM's position is that as a matter of law cover does not apply here because the undisputed facts establish that it did not make any post-breach electricity purchases to replace the electricity that the Wind Farms failed to provide as their Agreements required. Therefore, the argument goes, whether the Wind Farms' defensive cover theory applied was a pure question of law for the trial court to decide and should not have been submitted to the jury. And, according to TXUPM, had the trial court decided that legal question correctly, it should have entered judgment for TXUPM based on the $8,900,000 answer to Question 4. Because the facts regarding the Wind Farms' performance and TXUPM's balancing activities are undisputed, the key to TXUPM's argument, and the disposition of this point of error, is whether, as a matter of statutory construction, the words "After a breach" in § 2.712(a) constitute an element of the cover remedy.

Thus, regardless of the preservation method TXUPM asserted in the trial court, be it an objection that Question 5 should not be submitted or that the jury's answer should be disregarded, its legal argument comes to us in the context of a no evidence scenario. Therefore, before we can address the merits of TXUPM's fourth point of error we must first determine whether and, if so, how it preserved those arguments in the trial court because the answer to those questions determines the legal framework against which a "no evidence" standard of review applies.

Here, the standard of review framework is intertwined with the statutory construction issue regarding § 2.712(a)'s "After a breach" words. If those words constitute an element of the Wind Farms' defensive cover theory that were omitted from the charge and TXUPM preserved its statutory construction argument in the trial court, the no evidence standard of review is performed under Rule 279's omitted element framework. But, if TXUPM did not preserve its statutory construction argument, then the no evidence review would, as the dissent posits, be performed against the question and instruction as submitted. Accordingly, our first step requires us to first decide the nature and extent of TXUPM's trial court error preservation.

### 2.        Error Preservation Under Appellate Procedure Rule 33.1

Our ability to resolve substantive legal questions, like the statutory interpretation argument that TXUPM presents in this case, ordinarily turns on whether that argument was first preserved in the trial court. *See* TEX. R. APP. P. 33.1(a)(2) (error preservation is "a prerequisite to presenting a complaint for appellate review"). Error preservation can occur in several different ways. *See id*. 33.1(a)(1) (preservation can be accomplished by "request, objection, or motion"); *see also* TEX. R. CIV. P. 273–74, 276 (rules specific to jury charge error preservation); *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992) (listing ways to preserve no evidence point). The common characteristic, however, is that the party seeking to preserve a legal argument for our review usually must invoke a procedure that apprises the trial court of the argument in a way that calls for the trial court to decide that issue. *See* TEX. R. APP. P. 33.1(a) (preservation requires either a ruling or a refusal to rule); *Burbage v. Burbage*, 447 S.W.3d 249, 257 (Tex. 2014) ("[T]he objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem."); *In re S.H.V.*, 434 S.W.3d 792, 801 (Tex. App.—Dallas 2014, no pet.) (party must both "take proper action to make the trial judge aware of the complaint and obtain a ruling, either express or implied").

Here, TXUPM presented its no evidence of cover argument to the trial court both by objecting to the submission of Question 5 and by later asking the trial court to disregard the answer to that question. For the following reasons, we conclude that TXUPM preserved its fourth point of error arguments for our review. *See* TEX. R. APP. P. 33.1(a)–(b).

Had TXUPM moved for a directed verdict against the Wind Farms' cover theory because there was no evidence of any post-breach replacement purchases, the language of Question 5's instruction would not matter and it would be beyond debate that TXUPM preserved its case dispositive statutory construction argument. *See First Nat'l Collection Bureau, Inc. v. Walker*, 348 S.W.3d 329, 337 (Tex. App.—Dallas 2011, pet. denied) (discussing legal sufficiency preservation in a jury trial). There is no logical difference between preserving the legal argument that way and doing so by objecting to an instruction for the same reason. In both instances, the challenging party apprises the trial court of the purported legal error in time for the trial court to correct it. In both instances, the challenge is that as a matter of controlling law there is no question for the jury to decide, not whether the jury is being given a technically correct question to decide.[8] The same analysis and result also apply where, as here, the challenging party presents its legal argument in a motion to disregard the answer to that question.

Accordingly, by objecting to the submission of Question 5 about whether it effected cover or by asking the trial court to disregard the answer to that question, TXUPM preserved its legal argument that § 2.712(a) requires post-breach conduct taken for the purpose of effecting cover before that remedy applies.

---

[8] Whether a particular statutory remedy is available is a legal question for the court to decide. *See Wal-Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278, 280 (Tex. 1999).

### 3.    *Osterberg v. Peca*

This is not a situation like *Osterberg v. Peca* where there was no prior objection to the question or any other basis for preserving the appellants' legal argument to the trial court in the first instance.  *See* 12 S.W.3d 31, 54–56 (Tex. 2000) (issue of correct statutory requirements not preserved because the issue was not presented to trial court by motion or charge objection).  Specifically the relevant substantive issue in *Osterberg* was whether the election code's campaign finance reporting requirements were met by substantial compliance with the applicable filing deadline.  The jury found that the defendants did not file by the date specified in the charge.  The defendants, however, argued on appeal that the sufficiency of the evidence supporting that answer should be measured by a "substantial compliance" standard instead of a literal compliance standard.

The supreme court affirmed the court of appeals' decision to perform its evidentiary sufficiency analyses measured by the literal standard stated in the charge because, as the supreme court repeatedly observed, the defendants never raised their substantial compliance argument in the trial court:

> *On appeal, the Osterbergs argued for the first time* that they need only "substantially comply" with the Election Code's expenditure reporting provisions, and they did so.  They contended that because there was insufficient evidence *to support the unrequested "substantial compliance" issue*, the evidence was legally and factually insufficient to support the jury's finding that they failed to report their expenditures.
>
> The court of appeals held that the Osterbergs waived their substantial compliance argument.  The court explained:
>
>> The Osterbergs *never argued prior to, or during, trial* that substantial compliance satisfies the filing requirements of Section 254.124. . . .
>
> * * *
>
> The Osterbergs could instead be arguing that when a court submits a defective issue to the jury, an appellate court should review the sufficiency of the evidence against the question and instruction that the trial court should have submitted—not the one actually submitted—*even if the defect was never brought to the*

–12–

*court's attention* and the question or instruction never requested. That assertion is misguided. Even if Peca [the plaintiff] had a burden of proof with regard to some substantial compliance standard—an issue we do not decide today—it is the court's charge, *not some other unidentified law*, that measures the sufficiency of the evidence when the opposing party fails to object to the charge. [Citations omitted]. As we recently stated in *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91 (1999), if the trial court has "to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial."

12 S.W.3d at 54-55 (emphasis added); *see State Dept. of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.").

Here, TXUPM repeatedly apprised the trial court of TXUPM's position. At a minimum, it did so when it objected to the charge. And it did so again when it moved to disregard the Question 5 answer. Because TXUPM told the trial court what TXUPM believed was the correct standard for applying the law to the undisputed facts, we conclude that it preserved its argument in the trial court.

### 4.     Rule of Civil Procedure 279 and Omitted Elements

Because TXUPM preserved its statutory construction argument, and assuming it is correct about what § 2.712(a) requires, Rule 279 would require us to perform a no evidence analysis compared to a deemed finding on that element which would support the trial court's order. *See* TEX. R. CIV. P. 279; *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228–29 (Tex. 2011). Specifically, the supreme court's *Service Corp.* opinion implicitly clarified the line of cases holding that evidentiary sufficiency is measured against the given charge if there is no objection to the question or instruction at issue:

When an element of a claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element then the omitted element is deemed to have been found by the court in such manner as to support the judgment. TEX. R. CIV. P. 279; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

–13–

> Here there was no objection to the charge on the basis that it omitted the element nor did the trial court make findings on it, so there is a deemed finding in support of the judgment. But just as with any other finding, there must be evidence to support a deemed finding. Thus, we next address whether legally sufficient evidence supports the finding here. *See In re J.F.C.*, 96 S.W.3d at 276; *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990).

348 S.W.3d at 228–29.

The supreme court so held despite the court of appeals' express holding in that case that, "In the context of a jury trial, the sufficiency of the evidence is reviewed in light of the charge submitted if no objection is made to the charge." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 239, 245 (Tex. App.—Corpus Christi 2009), *rev'd*, 348 S.W.3d at 228–29. It thus follows that the supreme court rejected the court of appeals' "charge as given" rule for the express language in Rule 279 because the alleged legal error was otherwise preserved.[9] *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 612–13 (Tex. App.—Dallas 2011, pet. denied); *Alfia v. Overseas Serv. Haus, Inc.*, No. 05-11-01390-CV, 2013 WL 3477345, at *3–4 (Tex. App.— Dallas July 9, 2013, no pet.) (mem. op.).

But here it is undisputed that TXUPM never made post-year-end replacement electricity purchases. Thus, the dispositive issue is whether § 2.712(a) imposes a post-breach purchase requirement as an element of proving § 2.712(a) cover. Accordingly, we address the threshold statutory construction question TXUPM preserved in the trial court and presented to us to decide.

### 5. The Applicable Statutes

Given the undisputed facts, this becomes a statutory construction case. When construing a statute, we attempt to ascertain and effectuate the legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We start with the plain and ordinary meaning of the statute's words. *Id.* If a statute is unambiguous, we generally enforce it according to its

---

[9] We note that the appellate briefs reflect that Service Corp. moved for a directed verdict and a JNOV on legal and factual sufficiency grounds.

plain meaning. *Id.* We read the statute as a whole and interpret it so as to give effect to every part. *Id.*; *see also Phillips v. Bramlett*, 288 S.W.3d 876, 880 (Tex. 2009) ("We further try to give effect to all the words of a statute, treating none of its language as surplusage when reasonably possible.").

Here, it is undisputed that the Agreements required the Wind Farms to deliver annual quantities of electricity as determined by a post-year-end analysis. Moreover, electricity's fungible and ephemeral nature made it impossible for TXUPM to replace previously non-delivered electricity with substitute electricity days, weeks, or months later.

Accordingly, as we explain below, unambiguous statutory language compels the result that TXUPM's pre-breach balancing acquisitions as a matter of law could not be evidence of covering transactions that would bar TXUPM from pursuing a market damages theory. That is, any electricity TXUPM acquired from other sources to ensure its pre-breach ability to meet its daily customer demands cannot be considered evidence of a cover purchase because the balancing transactions occurred *before* there was a contract breach to be remedied. *See* TEX. BUS. & COM. CODE §§ 2.711(a), 2.712(a).

Specifically, the cover remedy is available to an aggrieved buyer who, after the seller breaches the contract by failing to deliver goods as required, in good faith reasonably purchases goods to substitute for those the seller failed to deliver:

> After a breach *within the preceding section* the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

*Id*. § 2.712(a) (emphasis added).

The "preceding section" is § 2.711, captioned "Buyer's Remedies in General; . . . ." As its caption suggests, § 2.711 states the remedies generally available to a buyer when the seller breaches its contract by failing to deliver a contractually required quantity of goods. *Id.*

–15–

§ 2.711(a).  A buyer so situated may choose between effecting cover under § 2.712 or recovering market damages under § 2.713:

> Where the seller fails to make delivery . . . the buyer *may* . . . in addition to recovering so much of the price as has been paid (1) "cover" and have damages under the next section [§ 2.712] as to all the goods affected whether or not they have been identified to the contract; *or* (2) recover damages for non-delivery as provided for in this chapter (Section 2.713).

*Id*. § 2.711(a) (emphasis added).

Accordingly, cover "is not a mandatory remedy for the buyer."  *Id*. § 2.712 cmt. 3.  That is, an aggrieved buyer need not minimize its damages by "covering" and not doing so does not bar it from pursuing a market price damages theory:

> Under § 2.712(c), upon seller's breach the buyer is not required to cover as a means of minimizing damages, and his failure to effect cover does not bar him from any other remedy.  Thus, on seller's breach a buyer is free to choose between damages based upon the difference between the contract price and the cost of cover under § 2.712, and damages for non-delivery, consisting of the difference between the market price at the time when the buyer learns of the breach and the contract price under § 2.713(a).

*Jon-T Farms, Inc.*, 554 S.W.2d at 750.

Thus, as a matter of unambiguous statutory language, a buyer aggrieved by a seller's failure to deliver the contractually required quantity of goods may either effect cover or recover market damages.  *See* TEX. BUS. & COM. CODE §§ 2.711(a), 2.712(a).  Likewise, also as a matter of plain statutory language, a buyer may effect a cover remedy only "[a]fter a breach."  *See id*. § 2.712(a).

Because the statutory language is unambiguous and there is no applicable precedent from us or the supreme court, we could end our analysis of this legal question here.

### 6.    Case law

The parties have not presented, and we have not found, a case squarely on point.  But *Jon-T Farms, Inc.* is close.  In that case, the buyer (Goodpasture) and the seller (Jon-T) in

–16–

January contracted for the seller to deliver grain to the buyer in October and November of that same year. Unfortunately, a railcar shortage developed and by November 30th the seller had delivered only slightly more than 20% of its contractual requirement. The buyer, however, encouraged the seller to keep delivering, exercised its right to extend the delivery period, and even used its own trucks to help the seller make deliveries.

But grain prices had increased after the parties created their contract, and the seller on December 10th sent the buyer a letter repudiating the contract by refusing to deliver more grain unless the buyer agreed to a price increase. The buyer, however, declined to do so and a week later sued the seller for § 2.713 market damages. In response, the seller (like the Wind Farms here) argued that the buyer could not recover market damages because (i) the buyer covered for the seller's breaches by meeting the buyer's customers' demand with grain that the buyer had otherwise previously arranged for and (ii) having "covered" for the seller's breaches, market price damages were no longer an available remedy.

The case was tried to a jury, which found that the seller breached the contract and caused the buyer substantial market price damages. The trial court rejected the seller's argument that the buyer had used its pre-breach arrangements to effect cover, thereby precluding a market price damages recovery, and entered judgment for the buyer accordingly.

On appeal, the seller argued that (i) there was no evidence supporting the damages finding because the buyer had used its other grain sources to cover for the seller's delivery breaches; (ii) the buyer did not proffer any evidence of its cover damages; and (iii) the alleged covering conduct precluded a market price damages recovery.

Our sister court in Amarillo reviewed business and commerce code §§ 2.711–2.713 in detail, analyzed the buyer's inventory management practices, and rejected the seller's argument

because the buyer was not required to cover and there was no evidence that it made any post-breach purchases for the purpose of covering for the seller's non-delivery breaches:

> The testimony of the plaintiff's witnesses, Long and Truitt, was that Goodpasture normally bought sufficient grain in order to meet its contracts for sale. There is no evidence that in Goodpasture's mode of operation it makes a specific purchase contract in order to meet the requirements of a specific sales contract. The company maintains "position" records as to its overall operation which disclose the total amount of grain it has contracted to sell and the total amount it has contracted to buy, and its "position" is maintained in order to fill its sales contracts. *The contract entered into between Jon-T and Goodpasture cannot be said to have been entered into to fill any particular outstanding commitment. The grain purchased is commingled with other grain.* Although in the overall operation Goodpasture may have bought some grain to compensate for the *undelivered* Jon-T grain to insure an adequate supply to meet its commitments, *there is no testimony that Goodpasture went out and bought specific grain to make up for the specific amount of grain undelivered by Jon-T.*

> In fact, this record reveals that Goodpasture filed its suit within a week after learning of Jon-T's breach and, as was its right, elected to seek the difference between the contract and market price, together with incidental and consequential damages. Goodpasture was not required to cover and there is no evidence of Goodpasture's purchase of grain for the purpose of cover during that week.

554 S.W.2d at 750 (emphasis added).

In sum, the Amarillo court rejected the seller's argument because the buyer's pre-breach purchases made to ensure its ability to meet its own customers' demands were no evidence of post-breach replacement purchases for the purpose of remedying the seller's actual breach.

The *Jon-T* facts are remarkably similar to ours except that, unlike generated electricity, (i) grain can be held in inventory and (ii) a specific lot can be segregated and delivered to a particular customer. And the Wind Farms argue that there was no testimony that the buyer (Goodpasture) bought specific grain to replace the grain that the seller (Jon-T) breached the contract by failing to deliver, whereas, here there was testimony that TXUPM's daily balancing practice was to take the Wind Farms' electricity first and then, if there was a shortfall from the Wind Farms' daily estimate, acquire replacement electricity from other sources to settle the

–18–

difference.  For several reasons, however, those distinctions and that argument do not suggest a different result here.

One, that grain can be held in inventory, segregated, and delivered to a specific customer would present a more compelling argument that a purchase from a different source replaced a specific seller's non-delivered grain.  That difference is significant because the cover damages measure requires the buyer to match the replacement goods' cost with the undelivered goods' contract price and to make additional adjustments related to specific matching transactions:

> The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . but less expenses saved in consequence of the seller's breach.

TEX. BUS. & COM. CODE § 2.712(b).  That calculus, however, would be extraordinarily difficult, if not impossible, where, as here, the breach occurs and is determined only after a full year of daily transactions, some of which were below and some of which were above the day-before projections, and the buyer has other supply sources simultaneously providing fungible and non-segregable goods.

Two, *Jon-T*'s reference to "undelivered" goods is statutorily significant.  Section 2.712(a) affords the cover remedy to compensate for a breach within § 2.711(a)'s scope.  Section 2.711(a) in turn enumerates a buyer's remedies, including cover, when "the seller fails to make a delivery."  *Id.* § 2.711(a).  But not just any "non-delivery" will support the cover remedy. Instead, the non-delivery must first breach a contract.  This principle is necessarily so because the code remedies apply only if there has first been a contractual failure to perform within the meaning of code subchapter E concerning "Performance" that produces a breach within the meaning of subchapter F concerning "Breach, Repudiation and Excuse."  That is, there is no statutory remedy unless there is a prior contract breach as statutorily defined.

–19–

Three, because the cover remedy is an alternative to market damages, its application requires an intentional decision to make a substitutionary purchase for the purpose of remedying a breach. That optional nature combined with § 2.713(a)'s requirement that the market contract price difference be measured "at the time when the buyer learned of the breach" means that the buyer must know of the breach and related quantity before it can decide on an informed basis between its cover and market price damages. *See id.* § 2.713(a). Accordingly, the Amarillo court correctly focused on whether there was evidence of post-breach purchases made for the purpose of effecting cover as opposed to routine pre-breach purchases to meet operational needs.[10] *See Jon-T Farms, Inc.*, 554 S.W.2d at 750. Thus, pre-breach balancing transactions for the purpose of meeting customer needs do not satisfy the statutory language or scheme.[11]

Finally, we note that in another part of the charge in the present case, the trial court instructed the jury that the Wind Farms had breached the Agreements and the breach upon which TXUPM's damages must be measured was the Wind Farms' failure to pay TXUPM for their annual deficiencies. This implicitly recognizes that breach was not measured on an interim basis during a compliance year, but rather that performance was assessed on an annual basis.

Therefore, we conclude that Question 5 should not have been submitted and once answered should have been disregarded. Thus, the trial court erred as a matter of law in both instances because that question was legally immaterial. *See Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994). We sustain the first part of TXUPM's fourth point of error.

---

[10] The seller also argued that certain grain purchases in the following spring were cover transactions, but the court rejected that argument because the court did "not find any evidence of such specific purchases for such alleged cover set out in the record." *Jon-T Farms, Inc.*, 554 S.W.2d at 750. Thus, that holding as to those post-breach transactions reinforces the principle that specific post-breach purchases must be matched to specific breaching non-deliveries to be cover transactions.

[11] The cases cited by the Wind Farms are not persuasive. Those cases involve anticipatory repudiation, which is not at issue here. *See, e.g.*, *Dura-Wood Treating Co. v. Century Forest Indus., Inc.*, 675 F.2d 745, 748 (5th Cir. 1982) (seller advised buyer that it would not be able to honor its contractual obligation to sell); *Commonwealth Edison Co. v. Allied Chem. Nuclear Prods., Inc.*, 684 F. Supp. 1434, 1437 (N.D. Ill. 1988) (fact issue concerning use of pre-existing contracts to cover after seller refused to provide uranium before the time of delivery claiming contract was void due to government action).

Furthermore, the trial court used the immaterial answer to Question 5 to disregard the jury's answer to Question 4 in which the jury found that the Wind Farms breaches regarding electricity and RECs caused TXUPM to suffer $8,900,000 in market damages for failing to deliver Renewable Energy, which the Agreements define to include both electricity and Renewable Energy Credits (RECs). Doing so was harmful, and thus reversible, error if it probably caused the rendition of an improper judgment (or probably prevented the appellant from properly presenting its case on appeal). TEX. R. APP. P. 44.1(a).

Because we conclude that the trial court should not have submitted Question 5 and should have disregarded the answer to it, we next consider whether TXUPM is entitled to recover the market damages the jury found in response to Question 4.

## C. Should TXUPM recover market value damages, and if so, in what amount?

### 1. The Answer to Question 4

Under § 2.713, the damages measure for a seller's non-delivery is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages, but less expenses saved in consequence of the seller's breach:

> Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (Section 2.715), but less expenses saved in consequence of the seller's breach.

TEX. BUS. AND COM. CODE. § 2.713(a). The jury awarded TXUPM $8,900,000 in damages.

The Wind Farms argue that there is no evidence to support market value damages because TXUPM's expert, Manu Asthana, offered irrelevant and unreliable expert testimony. According to the Wind Farms, Ashthana's models (i) do not measure the value of the Wind Farms' electricity at the correct time, and (ii) rely on inapplicable and unreliable pricing reports.

–21–

This no evidence point, however, was not preserved for our review. A no evidence point is preserved through: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or (5) a motion for new trial. *T.O. Stanley Boot Co.*, 847 S.W.2d at 220. Although the Wind Farms availed themselves of many of these procedural vehicles, every challenge to TXUPM's market damages request rested solely on the ground that market damages were not available because TXUPM had covered.

For example, the Wind Farms' motion for directed verdict argued that Asthana's damage models were not competent evidence solely because he failed to account for cover and market damages are unavailable to a party who covers. Likewise, when the Wind Farms objected to the jury charge, they complained that the charge did not state the appropriate damages measure because the appropriate measure was cover. Furthermore, there was no legal or factual sufficiency challenge to the $8,900,000 finding when the Wind Farms moved for judgment. And there was no motion for new trial, JNOV, or to disregard on these grounds. Consequently, the jury's finding that TXUPM suffered $8,900,000 in market damages is an unchallenged finding that sets a damages floor. *See Carbona v. CH Med. Inc.*, 266 S.W.3d 675, 687 (Tex. App.—Dallas 2008, no pet.).

On remand, the Wind Farms rely on § 1.305(a) for the premise that TXUPM should not recover the damages the jury awarded because TXUPM suffered no actual economic injury. *See* TEX. BUS. & COM. CODE § 1.305(a). This section provides:

> The remedies provided by this title must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed, but neither consequential or special damages nor penal damages may be had . . . .

*Id.* Comment 1 to this section states that "Compensatory damages are limited to compensation." *Id.* cmt. 1. Thus, the Wind Farms contend that we should render a take-nothing judgment because TXUPM suffered no actual economic injury.

This was not raised as an objection to Question 4, nor did the Wind Farms argue that the trial court should disregard the Question 4 answer for that reason. And the Wind Farms did not make that argument in their opening brief.[12] Accordingly, that argument is not properly before us. *See* TEX. R. APP. P. 33.1, 38(f).

Therefore, on this record, TXUPM is entitled to recover at least the $8,900,000 in market damages the jury found in Question 4. We thus sustain the first part of TXUPM's fourth point of error concerning the recovery of $8,900,000 in market damages.

### 2. TXUPM's Request for Increased Damages

TXUPM's remand brief argues that TXUPM's market damages recovery should be increased. Specifically, TXUPM contends that the jury "plainly" discounted the $20,900,000 damages it requested based on the Wind Farms' expert's testimony that damages should be reduced by $10,600,000 for lack of transmission capacity. Because this Court and the supreme court rejected the trial court's conclusion that TXUPM was contractually obligated to provide transmission capacity, TXUPM maintains that it is "entitled to the full amount of market price damages, untainted by the district court's erroneous transmission capacity holding." To this end, TXUPM requests that we add $10,600,000 to the jury's $8,900,000 finding, and render judgment for that amount. We decline to do so.

In the court below, TXUPM's motion for judgment asked the court to enter judgment based on the $8,900,000 award. Likewise, its brief in support of its motion for judgment prayed

---

[12] The Wind Farms' opening brief cited § 1.305 as supporting its argument that TXUPM could not recover market damages because it, according to the Wind Farms, elected to cover for the Wind Farms' electricity shortages.

for an $8,900,000 judgment. TXUPM's arguments in its initial appellate briefing were consistent with those requests. TXUPM, however, never asked the trial court to enter a $19,500,000 judgment, nor did it initially claim that the trial court erred in not doing so. Thus, there is no basis preserved for our doing so now. *See* TEX. R. APP. P. 33.1.[13]

In addition, there is no basis for us to conclude as a matter of law that absent the trial court's transmission capacity holding the jury would have awarded TXUPM $19,500,000 in damages. TXUPM's expert presented nine damage models and the amount of damages was disputed. We cannot speculate about what the jury intended when reaching a particular verdict, which entering the verdict TXUPM now requests would require us to do. *See Houston Med. Testing Servs. Inc., v. Mintzer*, 417 S.W.3d 691, 696 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

TXUPM argues that an appellate court may increase a jury award when the higher amount is established as a matter of law. *See, e.g.*, *Hill v. Spencer & Son, Inc*., 973 S.W.2d 772, 775–76 (Tex. App.—Texarkana 1998, no pet.) (appellate court may render judgment if no evidence supports the award and undisputed evidence conclusively established the amount as a matter of law). Here, however, there is no undisputed amount, and it is not established as a matter of law. We thus resolve the second part of TXUPM's second issue against it.

### 3.    Conclusion

For the reasons previously stated, we conclude that:

(i) effective cover under business and commerce code § 2.712(a) requires as an element that the buyer make an after the breach purchase or contract to purchase goods in substitution for those due from the seller;

---

[13] TXUPM's remand brief also argues that the law of the case doctrine applies to foreclose all challenges to its request for a judgment "in excess of $20 million." We disagree. Neither this Court nor the supreme court decided any part of TXUPM's claim for market damages, and the law of the case does not apply to legal issues that were not decided in prior appeals. *See Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 363 (Tex. App.—Dallas 2004, pet. denied).

(ii) resolution of TXUPM's fourth point of error requires us to conduct a no evidence review to determine whether the trial court erred by submitting Question 5 to the jury or by denying TXUPM's motion to disregard the answer to that Question;

(iii) because the "after a breach" element was omitted from the Question 5 instruction without objection but TXUPM preserved its statutory construction argument, our no evidence review is conducted under Rule 279 measured against that missing element;

(iv) the trial court instructed the jury that, "It has been established that the Wind Farms were deficient in providing the required minimum Annual Quantity of Renewable Energy for the years 2002, 2003, 2004 and 2005 and failed to comply with the Agreements by failing to pay [TXUPM] for this deficiency[;]"

(v) no party challenged on appeal the legal or factual sufficiency of the evidence supporting that instruction;

(vi) it is undisputed that there is no evidence that TXUPM made any post-breach purchases of electricity to substitute for electricity that the Wind Farms failed to deliver as contractually required;

(vii) the trial court erred by submitting Question 5 and by denying TXUPM's motion to disregard the answer to that Question;

(viii) no party challenged on appeal the legal or factual sufficiency of the evidence supporting the Question 4 answer;

(ix) the trial court erred by denying TXUPM's motion to enter judgment based on the Question 4 answer; and

(x) the trial court's errors caused the rendition of an improper judgment.

Accordingly, we reverse the trial court's judgment that TXUPM take nothing on its breach of contract claim and render judgment that TXUPM recover from the Wind Farms damages of $8,900,000.

**D.      TXUPM's Fifth Point of Error:  Is TXUPM entitled to retain the amounts collected under the letters of credit in partial satisfaction of the judgment?**

TXUPM's fifth issue argues that it is entitled to retain the amounts collected under the Wind Farms' letters of credit.  We agree.

The trial court declared that TXUPM was required to return the $3,075,000 proceeds from the Wind Farms' letters of credit that were posted as security for the Wind Farms' performance under the Agreements.  That ruling rested on the trial court's holding that TXUPM was not entitled to recover damages.  But we have concluded that TXUPM is entitled to recover market damages.  Therefore, the trial court erred in its conclusion, and TXUPM is entitled to retain the letter of credit proceeds in partial satisfaction of the judgment.  We sustain TXUPM's fifth issue.

**E.      Is TXUPM entitled to recover attorney's fees?**

The district court exercised its discretion under Chapter 37 to deny both parties' attorney's fees and award costs to the Wind Farms.  *See* Tex. Civ. Prac. & Rem. Code § 37.009.  Because neither party challenges that ruling, a request for Chapter 37 fees is not before us.

But TXUPM's motion for judgment on the verdict also argued that TXUPM was entitled to Chapter 38 attorney's fees and TXUPM prayed for fees in its original briefing when it asked this Court to render judgment on the breach of contract claim.  Thus, TXUPM argues that it is entitled to recover Chapter 38 attorney's fees because it established that the Wind Farms breached the Agreements and it is the prevailing party entitled to damages.  *See* Tex. Civ. Prac. & Rem. Code § 38.001.  We agree.

–26–

Civil practice and remedies code Chapter 38 allows a reasonable attorney's fees recovery in breach of contract cases. *Id*. To recover attorney's fees under § 38.001, a party must prevail on the underlying claim and recover damages. *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015); *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). An award of reasonable attorney's fees is mandatory under this section if there is proof of the reasonableness of the fees. *Ventling*, 466 S.W.3d at 154. A request in a prayer is sufficient to support an attorney's fees award. *See Tull v. Tull*, 159 S.W.3d 758, 762 (Tex. App.—Dallas 2005, no pet.) ("A general request for attorney's fees in the prayer of the pleading is itself sufficient to authorize the award of attorney's fees.").

We thus sustain TXUPM's request for attorney's fees. We reverse the trial court's judgment awarding costs to the Wind Farms, render judgment that TXUPM is entitled to recover its Chapter 38 attorney's fees, and remand the case to the trial court to determine the amount of such fees.[14]

## IV. DISPOSITION

We affirm the trial court's judgment that neither party is entitled to recover Chapter 37 attorney's fees.

We reverse the trial court's judgment that: (i) TXUPM take nothing on its breach of contract claim; (ii) the Wind Farms recover costs; and (iii) TXUPM return the funds accessed under the letters of credit.

We render judgment that TXUPM recover from the Wind Farms damages of $8,900,000 plus pre and post judgment interest and reasonable attorney's fees, and we further render

---

[14] The parties agreed on the record that attorney's fees and supporting evidence would be submitted to the trial court for determination after the verdict. Although TXUPM's brief requests rendition of judgment for fees in a specific amount, it does not cite any authority or provide any record references to support rendition. Accordingly, we leave the fees issue to the trial court on remand. *See Delta Steel Bldgs. Co. v. Crow*, 633 S.W.2d 343, 344 (Tex. App.—Dallas 1982, no writ) (remanding for determination of reasonable attorney's fee).

judgment that TXUPM is entitled to retain the $3,075,000 it accessed under the letters of credit in partial satisfaction of that judgment.

We remand to the trial court solely for the purpose of calculating pre and post judgment interest and to determine the amount of reasonable Chapter 38 attorney's fees and costs TXUPM is entitled to recover.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

Evans, J., dissenting

081584F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TXU PORTFOLIO MANAGEMENT
COMPANY, L.P. N/K/A LUMINANT
ENERGY COMPANY, L.L.C., Appellant

No. 05-08-01584-CV     V.

FPL ENERGY, LLC; FPL ENERGY
PECOS WIND I, LP; FPL ENERGY
PECOS WIND II, and INDIAN MESA
WIND FARM, L.P., Appellees

On Appeal from the 116th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 04-10314.
Opinion delivered by Justice Whitehill.
Justices Francis and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court that neither party is entitled to Chapter 37 attorney's fees is **AFFIRMED**.

The trial court's judgment that appellees FPL ENERGY, LLC; FPL ENERGY PECOS WIND I, LP; FPL ENERGY PECOS WIND II, and INDIAN MESA WIND FARM, L.P. recover their costs and that appellant TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, L.L.C. take nothing on its breach of contract claim and return the funds accessed under the letters of credit is **REVERSED**.

We **RENDER** judgment that appellant TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, L.L.C. recover from appellees FPL ENERGY, LLC; FPL ENERGY PECOS WIND I, LP; FPL ENERGY PECOS WIND II, and INDIAN MESA WIND FARM, L.P. actual damages of $8,900,000 plus pre and post judgment interest and reasonable attorney's fees, and that it is entitled to retain the funds accessed under the letters of credit in partial satisfaction of that judgment. We **REMAND** to the trial court for a calculation of pre and post judgment interest and for determination of the amount of appellant TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, L.L.C's reasonable attorney's fees.

It is **ORDERED** that appellant TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, L.L.C recover its costs of this appeal from appellees FPL ENERGY, LLC; FPL ENERGY PECOS WIND I, LP; FPL ENERGY PECOS WIND II, and INDIAN MESA WIND FARM, L.P.

Judgment entered August 18, 2016.