# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00773-CV

---

**Valerie Gray and 1720 W. Anderson Lane, L.L.C., Appellants**

**v.**

**Catherine Galvan, Appellee**

---

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001327, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Valerie Gray and 1720 W. Anderson Lane, L.L.C. appeal from a final judgment following a jury trial. The jury found that Gray made negligent misrepresentations related to the sale of Catherine Galvan's residence (the Property) and assessed $185,000 in damages against Gray. In the judgment, the trial court (1) awarded damages consistent with the jury verdict, (2) ordered that Gray and 1720 are jointly and severally liable after making a directed verdict that Gray was acting as 1720's agent when she made the negligent misrepresentations, (3) ordered that the Property belongs to 1720 after making "an independent conclusion of law" that a valid contract existed between Gray and 1720 for the purchase of the Property, and (4) disposed of all other requested relief, including 1720's request for attorney's fees under the contract. Gray and 1720 challenge the legal sufficiency of the evidence supporting the findings of negligent misrepresentation and damages findings. 1720 also challenges the directed verdict

that Gray was its agent (and therefore that 1720 was jointly and severally liable) and the trial court's failure to award it attorney's fees on a contract as the prevailing party.[1] Because we conclude that legally insufficient evidence supported the jury's finding that Gray made negligent misrepresentations and, therefore, that 1720, not Galvan, was the prevailing party, we reverse and render a take nothing judgment against Galvan and remand for determination of attorney's fees under the contract.

## BACKGROUND

This appeal arises out of Galvan's suit against Gray, a property manager; 1720, a residential real estate company; All of Austin Realty, L.L.C., an entity that does property management for 1720; and Brad Cullipher, the manager of both 1720 and All of Austin Realty, for claims of fraud and negligent misrepresentation related to the sale of Galvan's Property to 1720.[2] Over a four-day jury trial in April 2019, the jury heard testimony from: Galvan; Gray; Cullipher; Rosalio Duran, Galvan's relative; Jenna Hubbard, a licensed escrow officer; Danielle Poe, Cullipher's former assistant; and Scott Wheeler, a residential real estate appraiser. The following background recital is taken from the evidence presented at trial.

---

[1] In her appellee's brief, Galvan asserts a "cross-appeal issue" that the trial court erred in failing to award her reasonable attorney's fees pursuant to the Contract for the Property. But Galvan did not file a notice of cross appeal, and an "appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." Tex. R. App. P. 25.1(c). Galvan asserts that she preserved the issue by raising it in a post-trial response and motion, but she has not made any showing of "just cause." Moreover, even if Galvan had preserved the issue, she would not be entitled to attorney's fees under the Contract given our disposition.

[2] The jury did not find All of Austin Realty and Cullipher liable, and they are not parties to this appeal.

In 2003, Galvan bought and moved into the Property with her children. Ten years later, Galvan refinanced the Property with a $55,190 loan ($384.46 monthly payments) from Wells Fargo. After a series of family deaths including her brother's in March 2017, Galvan decided to sell the Property "because there were just too many memories there" and she was no longer able to make the mortgage payments. Galvan defaulted on her loan with Wells Fargo after making her July mortgage payment, was told by Wells Fargo that she had until November to reinstate the loan "before foreclosure was going to happen," and declined Wells Fargo's help to reinstate her mortgage through a modification of her loan "because it would put me back on a 30-year." Galvan testified that she was then told by Wells Fargo that the "latest date" she could "catch up" on her mortgage was in November but that she "wasn't worried about [the foreclosure date in November] too much, because [she] knew that [she] had until that date." Galvan explained that she planned to keep the Property until she could sell it by asking her uncle Duran to loan her the money and paying him back with the proceeds from the sale. Duran offered a $20,000 credit line, but ultimately Galvan never borrowed any money. Galvan asked Valerie Deyo to be her realtor, and according to Galvan, Deyo placed a "For Sale" and "Coming Soon" sign on the Property from August to October 2017 but never listed the Property on the market because Galvan told her to wait while she upgraded the house.[3] Based on conversations with Deyo, Galvan understood that if she performed the upgrades the Property's listed price could be increased from $350,000 to $400,000.

On September 27, Galvan met Gray, who does property management. Gray explained that at the time she met Galvan, "I was marketing to people in foreclosure and it was

_____

[3] Gray, on the other hand, testified that Deyo's sign must have been removed before she met Galvan on September 27 because there was no sign in front of the house when she arrived.

3

just sending a packet and saying, hey, do you know your options? You can get a loan modification, are you interested in selling, you don't have to just let your house go to foreclosure."[4] To find people, Gray would review open records and "run a search for all the notices of foreclosure for a specific day" to "get the address and the owner's name." Gray went to visit the Property after she ran a search for November 7 foreclosures and came across a Notice of Substitute Trustee Sale for the Property with Galvan's name and address.

In describing the September 27 meeting, Galvan explained that Gray "just came by, popped up uninvited." After Gray stated that she was a property manager, Galvan told her that she already had a realtor and that she was going to catch up on her mortgage payments to prevent foreclosure by borrowing money from her uncle Duran. Gray responded, "If you've already got a realtor maybe I can help you get into a house." Galvan told her that she would need to contact her realtor Deyo but asked Gray to check her credit score. Gray had Galvan sign some documents, explaining she needed them to do a credit check, but Galvan testified that she is unable to identify the documents she signed because she never received a copy from Gray. At trial, Gray identified one document as an Authorization to Release Information, which allowed her to get Galvan's loan status and the payoff and reinstatement figures, and another document as a form 1 To 4 Family Residential Contract (the Contract), and these documents were admitted into evidence. Gray testified that she gave Galvan an opportunity to review the documents and that Galvan reviewed them page by page and initialed each page. The Contract listed a closing

---

[4] Gray explained her general role as "basically I take people's rent payments, I dispatch contractors when there's maintenance issues, I call in home warranty orders, I do evictions, I manage like a ledger for all the rents that come in and that kind of thing."

date of October 15.[5]  The sales price was left blank because, according to Gray, she is "not the buyer," she "do[es]n't know what somebody else would agree to," and therefore she generally "do[es] an amendment before closing that says, okay, sales prices has now been agreed upon and both parties sign that, so here is [an] amendment to the contract saying, you know, here is the agreed-upon sales price here is the new closing date, and whatever other terms change."  But Gray testified that she told Galvan that "it's not a valid sales contract . . . if you don't have a sales price, so I'm going to pull title, we'll find out what you owe on the house, what you owe in other liens, and then we agree on something, we'll do an amendment and that's it."  To that purpose, Gray took some pictures of the Property "[t]o present to 1720 [], to see if there was an interest in purchasing or if I could find a different investor that was interested in purchasing."[6] Gray testified that as she was leaving on September 27, Galvan told her that she "want[ed] to know if there's any liens, anything like that"; Gray responded, "[O]kay, I'll still pull title to find out what's on title" and "get you a price that we would pay for it, but I'm ultimately going to have to present to [] Deyo."  Gray "gave her a price"; Galvan responded that she "just want[ed] to keep working with [her] realtor"; and Gray said, "[O]kay, I'll help you find a rental." According to Galvan, the visit lasted for about an hour and she and Gray established a bond, communicated together about family and death, prayed together, and exchanged phone numbers.

---

[5]  At trial, Gray testified that Galvan had told her that "she was literally ready to close the next day, she said she wanted to get out of that neighborhood, she was ready to close as soon as possible."  Gray thought that October 15 would be the latest possible date.  Cullipher testified that the October 15 date was "cutting it close" to get the mortgage reinstated and deal with the banks before a November 7 foreclosure date.

[6]  Cullipher explained that 1720 often purchases properties that are on the foreclosure list as part of its business and described 1720's business as "solely residential real estate"; "[w]e buy, renovate, and we have a few rentals"; "[w]e've done occasional sales, as well, in terms of if we had something, some people call them flips, but if we rehabilitate something and then sell it."

After the meeting, Gray discovered that "the first lien was Wells Fargo home mortgage, which [Galvan had] disclosed," for $44,269.08 and the second was "a City of Austin Down Payment Assistance, some kind of City of Austin lien," for $18,970.34. On September 28, Gray emailed Hubbard with Independence Title Company and Cullipher with the Property address listed as the subject line and saying, "Here is a new one. We want to close tomorrow so if we can't get title back we may just go ahead and draw up the warranty deed. Bringing ME in now regardless, but let me know what you think."

From September 27 to October 16, Gray texted Galvan about finding a new house "a lot of times"—including 10 texts from October 6 to 15—and the texts were admitted into evidence at trial. But there were very few text responses because, according to Galvan, she "wasn't into texting . . . I was more into calling" and, "I never text her. I always called her." Galvan explained that the texts were not about closing because Gray "wasn't going to sell my house, she was going to get me into a house" and that "I already had a realtor to sell my house." For example, on September 29, Gray texted Galvan that she "came to get you [Galvan] at 1130 and made appointments for us to see those houses :( I have an appointment until 3 but I can come after if you'll be home." And on October 5, Gray texted Galvan, "Bring you everything I come up with tomorrow. I'm just going to pick you up for lunch and we can look over together. Sound good?" This time, Galvan responded, "Thanks mija." Gray testified that "on October 5th [Galvan] told me that her and [] Deyo were not working together anymore; that they had split up, they had a fallout or something like that, and that she was ready to move forward." Cullipher testified that Gray had presented 1720 as the buyer with certain purchase options for the Property, asked for 1720's approval for the options, and then met with Galvan on October 6 to go over them.

Gray testified that on October 6, she picked up Galvan to get a milkshake, and Galvan told her that she wanted to sell her house and that "her realtor wasn't doing her job." Gray asked "how much that we would pay for your house"; Galvan said "that's, you know, I want a higher offer, whatever"; Gray responded, "you don't have good credit and it's going to be hard for you to rent something or buy something right away, but here are some options"; and Gray listed some options on a piece of paper. Gray testified that later Galvan said, "okay, send me a picture of that paper." Gray texted Galvan "4507 Kind Way Austin, TX 78725" with a picture of a paper, but the copy of the text admitted into evidence is indiscernible other than showing a hand holding a piece of paper.[7] Gray testified that "Kind Way was one of the properties that I manage that had just become vacant and I sent her the address and said, hey, you can go clean this one and I'll pay you to go clean this house and you can check it out and see if it's a house that you would want to live in." Galvan did not testify as to the picture in the text, but Gray testified:

> So, on that, on that paper that I sent the picture of, in the text it was like Option 1, 2, 3, 4. And so I – I told her like Option 1 you can move into this property that I manage and live there two years rent free, and that would essentially be paid out the same as a retainer. So if rent is 1200 a month, so 1200 times 12 months times two years and you would get a portion of cash on top of that. Or you could get $10,000 up front and $60,000 when you move out. Or, look, you can just rent this for six months while you figure out something else to do and I'll do a reduced rate, and then you can get a certain amount of cash.

Gray explained that Galvan was initially drawn to the first option but eventually "came to option number four, and it was getting a little bit of money up front using the rest of the money towards paying, you know, getting something outright or something like that." Initially, they talked

---

[7] At trial, Gray's counsel asked, "It looks like a photo of some type of piece of notebook paper. . . . I know we can't read it, but can you tell us what that is?"

about $10,000 in cash up front and a $60,000 retainer, and later it changed to $3,000 in cash and a $75,000 retainer. Gray emailed Hubbard, a branch manager and licensed escrow officer with Independence Title Company, stating:

> I am praying I can shut this lady down today she is finally acting normal. Can you please prep the closing docs? Closing under 1720 W Anderson Lane LLC, POA Danielle Poe. Payoff to Wells Fargo is $44,269.08 + that HUD lien. I'll send subject to addendum. Seller to net 70k. 10k at closing and 60k retainer. We pay all closing costs, fees, etc. These figures may not be 100% but i would rather be prepared to close than lose her for another week.[8]

After Hubbard emailed, "Sure thing," Gray responded, "I'll know if she can close today by 320. If so I'll pick her up and race over there." But no closing occurred.

From October 10 to 15, Gray texted Galvan a series of texts that had no text responses from Galvan, although Galvan testified that she called Gray back: on October 10, Gray texted, "Hey Lady! Home? I found a house I want to come show you pics of"; on October 11, "Hey lady called you"; on October 14, "Let me know you're ok you're worrying me"; and on October 15, "I'll come over tomorrow instead." On October 16 at 1:19 a.m., Galvan texted Gray: "Mona, let me know what time? Sorry but my mom is hardly seen with this selling home process. Want my life back. I sincerely apologize and can you see our Valarie had 86th

---

[8] Gray testified that in writing "shut this lady down," "I used a poor choice of words after she had ducked me for closing," and, "What I meant is because it was hard to get ahold of her, y'all are busy, I'm busy, we all have regular jobs, and having to drive to somebody's house and not show up when we said we were going to be there and not do the – what they said they were going to be, it's tough. And because she wanted to close, I was praying she would close and follow through and I wouldn't stop my day to go pick her up and get this done for her and her not follow through again. So I used a bad choice of words and I regret it, but I just meant that I was praying that she would be there when I showed up and she would really close like she said she was going to close."

on the market for $375,000?"[9]  Galvan testified that "86th" referred to another house that Deyo had on the market.  At 9:39 a.m., Gray responded, "Hey, have a minute?  Good news."  At trial, Galvan explained that the "good news" was not that she was going to close on the Property "because [she] already had a realtor to do that" but that Gray had told her that she had found her a house and that "if she was going to put me in a house that I – I would have to go to her company," "would have to sign some forms at her company," and "would need to sign up with her, I don't know, real estate company, in order for me to get a realtor."

Later that day, Galvan texted Gray, "I need to talk ASAP."  Galvan explained at trial that she had needed to tell Gray "that I couldn't get into a house until I sold my house first" and that "I wanted to get my money so that I can pay for the house she was trying to get me into but I wanted to do it cash so I wouldn't have to, you know, have a mortgage payment."  Gray texted later that afternoon, "I'm close by.  Want me to come over now or later?"  Gray came over "about five and fifteen minutes after that," and Gray testified that Galvan "was really upset" and "started reading the texts that Valerie Deyo had sent her, and they were mean," and "she knew Valerie Deyo wasn't going to sell her house anymore."  Gray testified that she "was there for about one to two hours" and that Galvan said, "I think that the offer you presented me with, I just want to do it, I just want to be done with this house and get into something else."  Galvan did not testify as to this conversation or text exchange; instead, she testified that Gray had explained that she had found Galvan a house and that she was there to pick Galvan up to "go see her friend at her company" and to sign some forms with her company.  On the car ride over, Gray called to

---

[9] The text continued, "Muchos good night.  Can't wait for Tru[l]ucks."  At trial, Galvan explained that "Tru[l]ucks" is a restaurant she wanted to take Gray to for lunch "because I thought she was my friend."

get the electricity turned on at Galvan's house as Galvan was living without electricity at that time (Galvan explained at trial that most of the money she earned cleaning houses was going towards refurbishing her house[10]), which Galvan testified impressed her.[11]    Additionally, according to Galvan, "on the way over there [Gray] said she was going to get me some money to pay for bills, she told me she was going to get me into a house," and she "said that nobody was going to evict me until she got me into a house."  Galvan explained that she believed Gray because "[w]hen she turned on my electricity I thought she had a lot of pull."

Galvan testified that when they arrived at the office, Hubbard made a copy of her I.D., and that "I remember signing some forms, because I was like there like ten minutes."  When asked whether she knew at the time what she was signing, Galvan said "Yes.  I mean, well, not really, because I – [Hubbard] asked me, 'Do you know what you're doing?'  And I said, 'Not really.'"  Galvan described that before signing, she said to Gray:

> I said, Look at me, look at me in my eyes and tell me that that's what you're going to do.  You're going to get me somebody who is going to sell me the house, you told me that you were going to get me in a house, nobody was going to evict me, you were going to give me some money to pay the bills, and that, you know, trust me, and you kept saying, "Just trust me." [12]

---

[10]  Galvan testified that during the time she met Gray, she paid about $2,500 to do upgrades, including painting the house, doing some tile work, changing faucets, and landscaping.

[11]  Gray testified that she called Cullipher's assistant Poe and "once we were closing on the property I was able to have [Poe] call the City of Austin, say, hey, it's a new owner, we're going to turn utilities on in this new owner's name, and that was while [Galvan] and I were in the car together.  It was on speakerphone" and the new owner that was identified was 1720.

[12]  At another point in trial, Galvan described herself as saying to Gray:  "I just trusted [Gray] and I remember looking at her and said – told her, 'Look me in the eyes,' you know, you're promising all this to me, and I said it in front of [Hubbard], I really didn't know what I

When asked on cross examination with what money Gray would get her a house and pay her bills, Galvan said with "[m]y money" and "[w]ith the money to – that my house was going to be purchased for." Galvan testified that she "didn't look at the paperwork" and that "it was late in the evening and, um, I didn't get to see any of the forms, they didn't give me no copies, they just said, sign here, sign, here, sign here. They just kept flipping the page." Gray, on the other hand, testified that Galvan asked questions, including about an amendment to the September 27 Contract (the Amendment), and was there "maybe 30 to 45 minutes." Gray testified that the Amendment was

> the first document she signed and I read it out loud to her, and I said, seller shall receive $3,000 in closing and 75,000 to be held as retainer until seller vacates. And she told me that she didn't need longer than 30 days and she was already ready to move out. But regardless. We put that 60 days in there, just to be sure that she had enough time to move out. And I said, you're going to get $75,000 so you better not duck me when we go see these houses, let's get you into, you know, something that you can pay off right away. And she said, I won't.

The Amendment was a single page and did three things. First, it stated "[t]he Sales Price in Paragraph 3 of the contract is A. Cash portion of Sales Price payable by Buyer at closing $78,000.00 B. Sum of financing described in the contract $70,000.00 C. Sales Price (Sum of A and B) $148,000.00."[13] Second, it stated that the closing date of the contract is changed to October 16, 2017. Third, it listed the following after "Other Modifications":

---

was signing, I just know that I was trusting her to get me into a house. And that nobody was going to evict me, and she said, 'Trust me, trust me.'"

[13] Gray testified that she calculated the price as a range and that 1720 then "came up with a price that they would pay." Gray testified that she looked at comps, arrived at a $200,000 figure and "that's how we got to the 148 figure once we subtracted like commissions, title, and what could be wrong as far as there could have been foundation – we still didn't know if there's foundation issues, broken plumbing, if the roof is good or bad or anything like that."

> Buyer is purchasing property subject to existing lien with Wells [F]argo and city down payment assistance lien. Seller shall receive 3k at closing and 75k to be held as retainer until seller vacates. Seller has 30 days to vacate property. Seller shall vacate no later than 11/17/2017 with no charge. If seller doesn't vacate by 11/17/2017 $2000.00 will be applied from retainer towards rent for November. If seller doesn't vacate by 12/17/2017, then all monies retained/due to seller will be forfeited.

The Amendment and the other closing documents, including a general warranty deed for the Property, were admitted as evidence at trial and had, where needed, Galvan's signature dated October 16 and 1720 as buyer with Cullipher's signature on 1720's behalf. Gray testified that after Galvan signed, "all the closing documents were signed" by Cullipher, but that the Amendment "doesn't have to be signed in person, it's usually sent via DocuSign and all of that, and my recollection is it was signed [by Cullipher] prior to." Hubbard also testified that the Amendment was signed prior to closing. On cross examination, however, Gray's deposition testimony was introduced that Galvan did not leave with any documents after closing, including the Amendment, because "the buyer hadn't signed any of this, only [Galvan]." Hubbard testified that when she placed the general warranty deed in front of Galvan, she told Galvan "it was the document that transfers title to the property to the purchaser." Hubbard also testified that she "witness[ed] [Galvan's] signature on this document" and "every single document at closing." Hubbard explained that Cullipher was not present at closing but signed the closing documents on a different occasion that was witnessed by Hubbard's coworker.

Galvan testified that after leaving the office, she and Gray went out to eat but did not go out to look at the house that they were going to see "because it got kind of late after we ate." While they were eating, Galvan asked Gray, "How did you manage to get all this

12

together?" According to Galvan, Gray responded, "Well, I pretended to be you."[14] The next day, Gray came by to give her a $3,000 check but, according to Galvan, did not drop off any copies of the closing documents. At trial, Galvan explained that the $3,000 number came from Gray saying that "it would help [Galvan] pay some of [her] bill[s] that [she] was late on." Gray, on the other hand, testified that Galvan told her that "she didn't want all of the money up front . . . because she was scared she was going to spend it" and that "she just wanted enough to catch up on past due bills" and "$3,000 was good and she was fine getting the rest when she vacated." Galvan testified that she did not sign or cash the check because after Gray had told her she pretended to be her, "I didn't trust that this check was any good."[15] Galvan then went to Hubbard's office with a lawyer and requested the documents; she testified that she received some documents but not any of the contracts or the general warranty deed.

After October 16, Gray texted Galvan four other times, but did not meet with her again[16]: on October 25, "Hey lady how you doing"; on October 26, "Cat, you there?"; on October 29, "You're worrying me"; and on November 1, a listing of a home and "Remember... if you're not out by 11/17 your retainer is reduced by 2k & if you're not out by 12/17/17 you will lose the whole retainer. Have you found a place? I don't want to bug you if you have. Just want

---

[14] Gray testified, on the other hand, "I told her that like I fight battles like I'm her, that's it. I never said that, I didn't – I didn't need to pretend to be her. I said, I put myself in your shoes." According to Gray, there would be no benefit to pretending to be her because Galvan had already authorized her to contact Wells Fargo on her behalf.

[15] Galvan also explained that she did not want to cash the check because she remembered that when she spoke to a Wells Fargo agent, the agent said "Catherine, is [specified phone number] a good number to call you? And I said, that's [Gray's] number."

[16] Gray testified that she got into a car wreck, which made stopping by difficult.

13

to make sure you're taken care of." Galvan testified that after the November 1 text, she called back "several times" and left voice mails, including the following on November 12:

> Hey Valerie, it's Catherine. Listen, I got your message last night, but uh, honey, I never got any paperwork on you. I never got, like a contract or, I don't know what's a retainer. And I mean, can you let me know what all this is? And can you tell me what we have on paper because I never got nothing from the underwriter. I never got nothing from you. And I'm just wondering, um, if I'm ever going to hear from you. I mean, you were coming almost all the time. And ever since we signed my name and everything, I haven't heard from you. You're scaring me. You told me to trust you. And I'm just wondering if you're going to call me back. I been trying to contact you and you never answer. I know you're busy, honey. Call me back. Bye.

Gray testified that after she received Galvan's voicemail about not receiving the documents, she "made sure that Independent Title curried [sic] it to her the very next day after I got that voicemail." On November 13, Galvan received by mail a package of documents from Independence Title Company, but the package included only "the documents that the title company produces," including the general warranty deed, but "not any of the documents [Gray] produce[d], like the [A]mendment."[17] Galvan showed the documents to Deyo, and Deyo read them and told her that she had "signed the title."

On October 20, 1720 paid $7,929.67 to reinstate the mortgage and on November 16, it paid $41,633.50 to pay off the Wells Fargo loan in full. 1720 also paid off the $18,970.34 down payment assistance lien from the city, a delinquent 2017 tax bill, and $5,250.94 for the 2018 tax bill. 1720 also has been paying $731 a year for property insurance.

---

[17] The package consisted of 10 documents, including a Settlement Statement, Information Required for Form 1099-S, a Disclosure and Consent Agreement Subject to Sale, an Affidavit on Debts and Liens, an Affidavit of Identity, an Affiliated Business Arrangement Disclosure Statement, an Affidavit of Marital Status, a Closing Verification Agreement, and a General Warranty Deed.

14

On January 2, 2018, 1720 filed a sworn complaint for forcible detainer in Travis County justice court, alleging that it provided Galvan with written notice to vacate on December 19, 2017, and that Galvan had failed to vacate or pay rent for staying on the Property. At trial, Galvan testified that at the eviction proceeding she saw Gray for the first time since October 17, 2017; that she received a copy of the Amendment at the eviction hearing; and that she had never received that document prior to the eviction hearing. Galvan admitted that she signed the Amendment but explained that it "was mixed in with a whole bunch of forms" that she signed on October 16, 2017; that it was never provided to her before the eviction proceedings; and that it was not included in the package she received on November 13 from Independence Title Company. Galvan also testified that the eviction court told her she could stay in the house until the case was over and admitted that she is not currently paying rent to stay in the house; by the time of the trial, Galvan had been living in the Property rent free for approximately seventeen months. Gray, on the other hand, testified that "[w]e said in eviction court we would give her the $75,000. We said it multiple times. She just had to move out. We just needed her to vacate."

The eviction proceeding was abated, and on March 12, 2018, Galvan sued 1720, Gray, All of Austin Realty, and Cullipher, for claims of fraud in a real estate transaction, conspiracy to commit fraud, breach of fiduciary duty, constructive eviction, violation of Texas Penal Code Section 32.46 (Securing Execution of Document by Deception), exemplary damages, and attorney's fees. The defendants answered with a general denial, and 1720 also counterclaimed for breach of contract, promissory estoppel, equitable interest in the property, reimbursement, suit for trespass to try title, specific performance by vacating the Property. and attorney's fees on the Contract. The trial court granted partial no-evidence summary judgment

15

on Galvan's claims for breach of fiduciary duty and constructive eviction. Galvan then amended her petition to add negligent misrepresentation and negligence claims.

A four-day jury trial occurred in April 2019. In addition to the testimony and evidence described above, Galvan submitted evidence that the Property was appraised at $355,000 while the defendants' appraiser appraised the Property at $230,000. The charge asked the jury whether Gray had committed statutory fraud and if not, whether she had made a negligent misrepresentation. The jury answered no to statutory fraud and yes to negligent misrepresentation and awarded $185,000 in damages. The trial court signed a judgment consistent with the verdict, made a directed verdict that Gray was acting as 1720's agent when she made the negligent misrepresentation, ordered that Gray and 1720 are jointly and severally liable for the damages, and dismissed with prejudice all other claims and counterclaims. Gray and 1720 appealed from this judgment.

## DISCUSSION

On appeal, Gray and 1720 raise four issues. First, 1720 challenges the directed verdict that Gray was acting as 1720's agent. Second, Gray and 1720 challenge the legal sufficiency of the evidence supporting the jury's finding that Gray made a negligent misrepresentation on which Galvan justifiably relied. Third, Gray and 1720 challenge the legal sufficiency of the evidence supporting the damages finding. Finally, 1720 asserts that the trial court erred in denying its request for attorney's fees and court costs based on the Contract. Because we conclude that the second issue is dispositive of the first and third issues, we consider it first.

16

**Negligent Misrepresentation**

In their second issue, Gray and 1720 challenge the legal sufficiency of the evidence supporting the negligent misrepresentation finding on two bases: that the alleged negligent misrepresentations did not supply false information and that Galvan did not justifiably rely on the allegedly false information. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018); *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, the jury charge instructs that negligent misrepresentation occurs when (1) "a party makes a representation in the course of her business or in a transaction in which she has a pecuniary interest," (2) "the representation supplies false information for the guidance of others in their business," and (3) "the party making the representation did not exercise reasonable care of competence in obtaining or communicating the information." *See Orca Assets*, 546 S.W.3d at 653–54 (describing elements of negligent misrepresentation). "[F]alse information" is not defined by the charge, and the charge's prefatory general instruction indicates that the jury should apply the "ordinary meaning" of words in the absence of a technical definition.[18]

---

[18] As relevant to the "false information" element, the parties did not object to the question or instruction or request additional instructions. Gray and 1720 did object and request an instruction on "justifiable reliance" that it consists of actual and reasonable reliance.

To determine a term's ordinary meaning, "[w]e typically 'look first to dictionary definitions.'" *Texas Dep't of Crim. Justice v. Rangel*, 595 S.W.3d 198, 208 (Tex. 2020) (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)). Dictionaries define "information" as "the communication or reception of knowledge or intelligence," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/information (last visited Oct. 25, 2021), and as "[k]nowledge or facts learned, especially about a certain subject or event," *The American Heritage Dictionary of the English Language* (5th ed. 2020), https://www.ahdictionary.com/word/search.html?q=information (last visited Oct. 25, 2021). Consistent with the ordinary meaning of the term "false information," longstanding and uniform case law instructs that "[t]he term 'false information,' as used in the elements of a negligent misrepresentation claim, means a misstatement of existing fact, not a promise of future conduct." *Bexar-Mar Int'l, LLC v. Combi Lift GMBH*, No. 01-19-00171-CV, 2020 WL 4979527, at *10 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.); *see also Crane v. Hanna*, No. 13-18-00534-CV, 2020 WL 3478673, at *3 (Tex. App.—Corpus Christi–Edinburg June 25, 2020, no pet.) (mem. op.); *First Bank v. Brumitt*, 564 S.W.3d 491, 495 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 760 (Tex. App.—Fort Worth 2012, pet. denied); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 579 (Tex. App.—Dallas 2007, no pet.); *BCY Water Supply Corp. v. Residential Inv., Inc.*, 170 S.W.3d 596, 602 (Tex. App.—Tyler 2005, pet. denied); *Tull v. Chubb Grp. of Ins. Cos.*, 146 S.W.3d 689, 697 (Tex. App.—Amarillo 2004, no pet.); *New York Life Ins. v. Miller*, 114 S.W.3d 114, 124 (Tex. App.—Austin 2003, no pet.).[19]

---

[19] In *Rhey v. Redic*, our sister court reviewed affirmative jury findings of negligent

Certain general principles underlie this understanding of the term "false information" for a negligent misrepresentation claim and the rule that the claim must be based on a misstatement of existing fact, not a promise of future conduct. First, "[t]ort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* § 92 at 655 (5th ed. 1984)). Thus, "there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made." *Id.* at 495 n.2. Although there is a "common-law duty . . . not to make a representation that supplies false information about an existing fact under certain circumstances," "[t]his common-law duty does not encompass a duty not to make false promises of future conduct." *Brumitt*, 564 S.W.3d at 495. Rather, a "negligent-misrepresentation claim on a failure to perform a promise of future conduct or on a representation that certain conduct would occur in the future . . . sounds in contract," *id.*, and therefore "[l]ike any other promise, it must be supported by consideration to

misrepresentation and statutory fraud. 408 S.W.3d 440, 450 (Tex. App.—El Paso 2013, no pet.). The court acknowledged that "[t]he type of false information contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct" but noted that the jury was not instructed on this point and that there was no objection to the charge. *Id.* at 452. With no evaluation of the charge's meaning and little analysis, the court summarily concluded, "Accordingly, we must measure sufficiency of the evidence by the charge actually given. There is ample evidence that [the defendant] represented to the [plaintiffs] that the roof would be repaired when she did not intend to do so. We conclude that the evidence is both legally and factually sufficient to prove that [the defendant] provided false information to the [plaintiffs]." *Id.* Here, in contrast to *Rhey*, there was no additional affirmative statutory fraud finding by the jury. And to the extent the *Rhey* court concluded that the term "false information" in the context of a negligent misrepresentation jury question—absent a jury instruction— includes not only a misstatement of existing fact but also a misrepresentation of a promise of future conduct, we disagree.

19

be enforceable," *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex. 2006) (Jefferson, C.J., concurring).[20] Here, Galvan neither pleaded a contract claim nor alleged that Gray's alleged promises were supported by consideration and enforceable as contract.

Second, "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations," and "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Thus, "a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." *Id.* Here, Galvan's primary theory at trial was fraud based upon Gray's alleged false promises, and the jury was instructed to answer the question on negligent misrepresentation only if it answered "No" to the fraud question. The charge explained that fraud may occur by "a false promise to do an act" that "is made with the intention of not fulfilling it."[21] However, the jury concluded that there was no fraud. And the charge did not include a similar instruction for negligent misrepresentation—e.g., that a negligent

[20] As we have noted, "the tort of negligent misrepresentation frequently involves a defendant's statement that a contract exists, upon which the plaintiff relies, only later to discover that the contract has been rejected or never completed," and "[t]hus, negligent misrepresentation is a cause of action recognized in lieu of a breach-of-contract claim, and is not usually available when a contract is in force between the parties." *New York Life Ins. v. Miller*, 114 S.W.3d 114, 124 (Tex. App.—Austin 2003, no pet.).

[21] The full instruction states, "Fraud Occurs when – 1. there is a representation of a past or existing material fact, and 2. the representation is made to a person for the purpose of inducing that person to enter into a contract, and 3. the representation is relied on by that person in entering into that contract. **OR** Fraud Occurs when – 1. a party makes a false promise to do an act, and 2. the promise is material, and 3. the promise is made with the intention of not fulfilling it, and 4. the promise is made to a person for the purpose of inducing that person to enter into a contract, and 5. that person relies on the promise in entering into that contract."

20

misrepresentation may occur by "a false promise to do an act" that "is made with the intention of not fulfilling it." Rather, the charge focused on whether "the representation supplies false information."

At every stage of this case, Galvan alleged that Gray's negligent misrepresentations were promises of future conduct, not misstatements of existing fact. In Galvan's live petition at the time of trial (the Fourth Amended Petition), Galvan asserted that the following misrepresentations occurred on October 16, 2017, and that "Galvan detrimentally relied on Gray's *promise*[*s*] when signing the forms/documents" (emphasis added):

- "Gray promised Ms. Galvan that she could stay at the Property if she signed the forms/documents";

- "Gray promised Ms. Galvan that Gray and All of Austin Realty/1720 W. Anderson Lane would help Ms. Galvan purchase a new truck if she signed the forms/documents";

- "Gray promised Ms. Galvan that Gray and All of Austin Realty/1720 W. Anderson Lane would take care of her bills if she signed the forms/documents";

- "Gray promised Ms. Galvan that if she signed the forms/documents, nobody would move her out of the Property until All of Austin Realty/1720 W. Anderson Lane sold the Property and until All of Austin Realty/1720 W. Anderson Lane gets her into a new house";

- "Galvan said that she was trusting Gray that Gray and All of Austin Realty/1720 W. Anderson Lane would help her sell the Property," "would help her get into a new house," "would help her purchase a new truck," and "would pay all of her bills," and

- "Gray nodded in the affirmative and said 'Yes, [Galvan], don't worry, trust me, I got you.'"

In closing argument at trial, Galvan's counsel argued to the jury that they had heard testimony that Gray promised to "A, put Miss Galvan in a new house, B, find Miss Galvan a better realtor to sell her house; and, C, nobody would move Miss Galvan out of her current house until Valerie Gray put her into a new house" if "Galvan signed up with a real estate company." Finally, in her

21

appellee's brief, Galvan asserted that Gray promised Galvan that "if she went and signed the documents, (1) [] Gray would help get [] Galvan into a new house, (2) nobody would evict [] Galvan from [the Property] until [] Galvan got into her new home, and (3) [] Galvan would get a new realtor to replace [] Deyo to sell [the Property]."

Measuring the sufficiency of the evidence by the jury charge and considering the evidence in the light most favorable to Galvan, as we are required to do, *see Orca Assets*, 546 S.W.3d at 653; *Osterberg*, 12 S.W.3d at 55, we nevertheless cannot conclude that Galvan presented legally sufficient evidence of a "representation" that "suppl[ied] false information" to support the jury's negligent misrepresentation finding, *see, e.g.*, *BCY Water Supply*, 170 S.W.3d at 603–04 (concluding that statement, "even when considered in a light that tends to support the jury's verdict, is not one of existing fact" and therefore "was no evidence supporting that the false information allegedly represented . . . comprised facts then in existence"). Because promises of future conduct are not "misstatements of existing facts," they cannot be considered "false information" for a negligent misrepresentation claim, according to the ordinary meaning of the term "false information" used in the jury charge and consistent with case law. We thus conclude that legally insufficient evidence supported the jury finding that Gray made a representation that supplied "false information." We therefore sustain Gray and 1720's second issue, reverse and render a take nothing judgment against Galvan, and need not consider Gray and 1720's first and third issues. *See* Tex. R. App. P. 47.1, .4.

22

**Attorney's Fees**

Having sustained Gray and 1720's issue on liability, we turn now to 1720's issue of attorney's fees.[22] As a counterclaim, 1720 pleaded "for the recovery of reasonable attorney's fees and all costs under and pursuant to Paragraph 17 of the Parties' Contract." The Contract provides, "Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding." And in the final judgment, the trial court stated that it "made an independent conclusion of law that a valid contract existed between Defendant 1720 . . . and Plaintiff for the purchase of . . . the Property," which Galvan has not challenged on appeal.

"[T]he availability of attorney's fees is purely a legal question," *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam), and a party must prove entitlement by contract or statute, *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). Examining similar "prevailing party" contractual language as contained in the Contract here, *id.* at 865 & n.1, the Texas Supreme Court has noted that "[w]hether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable," *id.* at 866 (quoting *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009)). And we have noted that the ordinary meaning of the term "prevailing party" in a contract provision awarding attorney's fees is "the party 'who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of its original contention.'" *Morales v. Carlin*, No. 03-18-00376-CV, 2019 WL 1388524, at \*7

---

[22] In their brief, appellants limited this issue to challenging the trial court's denial of 1720's request for attorney's fees; appellants do not assert that Gray is entitled to attorney's fees: "The trial court erred by failing to award 1720 W. Anderson Lane, L.L.C., its reasonable attorney's fees and all costs of this proceeding."

(Tex. App.—Austin Mar. 28, 2019, no pet.) (mem. op.) (quoting *Johns v. Ram Forwarding, Inc.*, 29 S.W.3d 635, 637–38 (Tex. App.—Houston [1st Dist.] 2000, no pet.)); *see also Hertzberg v. Austin Diagnostic Clinic Ass'n, P.A.*, No. 03-07-00072-CV, 2009 WL 2913620, at *6 (Tex. App.—Austin Sept. 11, 2009, no pet.) (mem. op.).  Here, the final judgment ordered that "title to the Property belongs to Defendant 1720," and we have reversed the portion of the judgment awarding Galvan damages and rendered a take nothing judgment against Galvan.  Accordingly, 1720 successfully prosecuted its claim and successfully defended against Galvan's fraud and negligent misrepresentation claims.  1720 is therefore the prevailing party for the purpose of paragraph 17 of the Contract and is entitled to reasonable attorney's fees and court costs.

However, although 1720 is entitled to recover reasonable attorney's fees and court costs under the Contract, "[t]he reasonableness of attorney's fees is ordinarily left to the factfinder," *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 547 (Tex. 2009); *see also Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501 (Tex. 2019) (describing standard for determining what constitutes reasonable attorney's fees), and we therefore reverse the trial court's judgment denying 1720's request for attorney's fees and court costs and remand that part of the case to the trial court, *see TXU Portfolio Mgmt. Co. v. FPL Energy, LLC*, 529 S.W.3d 472, 490 (Tex. App.—Dallas 2016, no pet.) (remanding to determine fees); *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 674 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (same).

### CONCLUSION

For these reasons, we reverse the trial court's judgment, render a take nothing judgment against Galvan, and remand for determination of attorney's fees and court costs.

24

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Reversed and Rendered in Part; Reversed and Remanded in Part

Filed:   October 29, 2021